## Case No. 6,794.

### HOWLAND et al. v. HARRIS.

[4 Mason, 497.] [1]

Circuit Court, D. Massachusetts. Oct. Term, 1827.

CUSTOMS DUTIES—LIABILITY OF GOODS FOR—SALE OF GOODS AT SEA—PASSAGE OF TITLE—RIGHT OF PURCHASER TO MAINTAIN TRESPASS.

1. The second proviso of the 62d section of the collection act of 1799, c. 128 [1 Story's Laws, 627; 1 Stat. 673, c. 22], makes the consignee of goods liable as owner for the duties thereon; but it does not prevent the consignee from passing, by sale or otherwise, a good title to the same goods, subject only to the payment of the duties thereon. If the consignee owes other bonds for duties, which are due and unpaid, he is entitled to no credit for duties at the custom-house; but the goods themselves may pass by sale, and are liable only for the duties payable thereon, and not for other duties due and unpaid.

2. Where goods are sold while at sea, the vendee acquires, without actual possession, a constructive possession, sufficient to maintain trespass against any wrong-doer.

3. When goods are imported in a ship, after such sale, and, before they are unladen, an inspector is put on board, his custody thereof, to secure the lien of the United States for duties, is not a divestment of the title and possession of the vendee as against a wrong-doer.

Trespass de bonis asportatis [by Gardner G. Howland and others, against Samuel D. Harris]. The case came before the court, upon a statement of facts agreed by the parties.

C. G. Loring, for plaintiffs.

G. Blake, Dist. Atty., for defendant.

STORY, Circuit Justice. Upon the statement of facts, the main question resolves itself into the consideration of the true construction of the second proviso of the 62d section of the collection act of 1799, c. 128 [1 Stat. c. 22]. The goods in question were attached by the defendant, the marshal of this district, as the property of George D'Wolf, who was the original owner and consignee, and before the arrival of the same in port, assigned the same bona fide for a valuable consideration, and as security for a prior advance of $5,000, to the plaintiffs. The assignment was made of the original cargo of the ship New Packet, belonging to G. D'Wolf, then absent on a voyage, and expected to arrive from the Mediterranean. The goods are the proceeds of the sales of the outward cargo, regularly made in the course of the voyage. The plaintiffs made the earliest efforts to obtain possession of the goods, after their arrival in port, giving due notice of their title; and the defendant took them under an attachment, at the suit of the United States against G. D'Wolf, for debts then due by him for duties. If, under all the circumstances, the goods, by the operation of the proviso above referred to, are, so far as the duty bonds due by the consignee are concerned, still to be deemed the

[1] [Reported by William P. Mason, Esq.]

property of George D'Wolf, notwithstanding the assignment, then the defendant is entitled to judgment in his favour; if otherwise, then the plaintiff is entitled to recover, unless some other objections stand in his way, partaking of a technical character.

The court may then at once address itself to the interpretation of the 62d section. The section begins by providing for the manner in which duties, on goods imported, shall be paid. When the duties do not exceed fifty dollars, they are to be immediately paid in cash. When they exceed that sum, the party is entitled to a certain credit, either by giving a bond with sureties, or by substituting for sureties a deposit of so much of the goods imported, as the collector shall, in his judgment, deem sufficient security. The section then proceeds to provide for the mode of selling the deposited goods on failure of due payment. Then follows this proviso, "that no person, whose bond has been received, either as principal or surety, for the payment of duties, or for whom any bond has been given by an agent, factor, or other person, in pursuance of the provisions herein contained, and which bond may remain due and unsatisfied, shall be allowed a future credit for duties until such bond shall be fully paid or discharged." If the clause stopped here, there would not seem to be any reasonable doubt as to its meaning or effect. The clause creates no lien on the goods imported for any antecedent duty bonds then due by the importer. It purports simply to deny any future credit upon goods imported until such bonds are paid. The consequence is, that the importer must pay the duties on such newly imported goods immediately in cash. He can obtain no credit, and is entitled to none, until his prior due bonds are satisfied. But upon such payment of duties in cash, he is clearly entitled to a delivery of such newly imported goods, for the act authorizes and countenances no detention of goods except for the duties payable on the same. The legal lien of the United States is extended no further, although a dozen bonds may remain due and unpaid. This is the necessary result of law, arising upon the construction of the act, in the absence of any positive provision for a more extensive lien. It was the received construction of the collection act of 1790, c. 62, § 41 [1 Story's Laws, 145; 1 Stat. 168, c. 35], where the same clause in substance occurs. And the case of Olney v. Arnold, 3 Dall. [3 U. S.] 308, demonstrates, in an unequivocal manner, that the clause was supposed to operate as a mere denial of credit. The true question there was, whether a collusive transfer, prior to the entry, did not entitle the assignee, under the transfer, to the usual credit as importer. The court, upon the clearest principles, held, that such a collusive transfer did not entitle the assignee to such credit. And it is more than probable, that this very question was the immediate

cause of the introduction of the new and additional clause, which now follows the preceding, in the 62d section of the act of 1799. c. 128 [1 Story's Laws, 627; 1 Stat. 673, c. 22]. It is in these words: "And to prevent frauds arising from collusive transfers, it is hereby declared (not enacted), that all goods, wares, and merchandise, imported into the United States, shall, for the purposes of this act, be deemed and held to be the property of the persons, to whom the said goods, &c. may be consigned, any sale, transfer, or assignment, prior to the entry and payment. or securing the payment of the duties on the said goods, &c. and the payment of all bonds then due and unsatisfied by the said consignee, to the contrary notwithstanding." The argument on behalf of the defendant is, that the operation of this clause is, to preserve the original ownership of G. D'Wolf in the goods in question, not only as to the credit for duties, but to the extent of authorizing an attachment of them, and taking them in execution, as the property of G. D'Wolf, in any suit brought upon any of his bonds for duties then due and unsatisfied. If this be the true exposition of the clause, it completely intercepts the legal effect of the assignment, and denies the power to sell any goods, so as to pass the property against the United States.

My opinion is, that this exposition is not well founded in point of law. It appears to me inconsistent with the professed objects of the statute, and is not called for by any sound public policy aimed at by its provisions.

In the first place, there is in no other part of the statute any provision that declares, that goods, entered by a consignee, shall be deemed his exclusive property, so far as the rights and remedies of the United States are concerned. Nor is there any general lien created, as has been already intimated, by which any imported goods are made security for the duties due upon any antecedent importations of the consignee. The true meaning and effect of this particular clause must, therefore, be sought in its own terms, and the context, with which it stands connected. In this view it is material to consider, that it stands in a section, the principal object of which is to provide for the payment of duties, and for the credit to be allowed for them; that it is part of a proviso, which denies such credit, where the party, as principal or surety, has any bond then due and unsatisfied. It forms, then, in its connexion, a qualification or explanation of the effect of that proviso. Its avowed object is to enforce the denial of such credit, and "to prevent frauds arising from collusive transfers." What were these frauds? Certainly not collusive transfers, in a general sense, affecting the general rights of creditors; but such as went to defeat the particular provisions of the statute. It was perceived, and indeed the case had already occurred, as Olney v. Arnold,

supra, demonstrated that transfers would be made for the purpose of obtaining the credit for duties, where the terms of the proviso meant to prohibit it. It was important, therefore, to declare, that such transfers should be unavailable; and to prevent the embarrassing inquiry, what transfers were, or were not collusive, the legislature wisely directed, that the consignee should, "for the purposes of the act," be deemed the owner. It cannot be presumed, that the legislature meant to interfere with the question of ownership generally, or to enact, in such a summary way, a general statute of frauds. The very language of the clause shows, that such an intention is not to be attributed to it. The goods, &c. shall, "for the purposes of this act," be deemed and held the property of "the persons, to whom the said goods, &c. may be consigned," &c. The transfer, then, is suspended in its operation only so far as the purposes of the act require. And these purposes nowhere appear to go beyond the point of a denial of credit for duties. In my judgment it would be a most dangerous precedent, to give to the general words of a proviso, which, in ordinary acceptation, only qualifies the enacting clause, so broad and sweeping a construction as that contended for. It would be creating, by implication, on the property of third persons, a lien for duties, which did not exist in the case of the original owner. If the legislature intended to raise such an universal and overreaching right for security of duties, it would have spoken in terms more direct and unequivocal. It would not have worked such a mighty prerogative into the conclusion of a mere disabling proviso. My judgment accordingly is, that the goods in question were not, in virtue of this clause, the property of G. D'Wolf, so that they were liable to be attached and taken in execution for his debts, antecedently due and unpaid at the custom-house.

The next question, which has been suggested, rather than argued, on behalf of the defendant, is, whether trespass lies against him under the circumstances of the case. The assignment passed a legal title to the original cargo, and the present goods, being the admitted proceeds of that cargo, by operation of law, passed to the plaintiffs. Actual delivery and possession of the goods was not indispensable to complete the plaintiff's title, the goods being then at sea, and the plaintiffs asserted their right, and gave due notice of it as soon as the ship arrived in port, and before the attachment was made. The possession of the master was indeed, under these circumstances, as he was a mere carrier, the possession of the plaintiffs. But a constructive possession, flowing from general ownership, and present immediate vested right of possession, would be sufficient for this action. The law, on this subject, is laid down with great clearness and accuracy by Mr. Justice Ashhurst, in delivering the opinion of the court in the case of Smith v. Milles, 1 Term

R. 475, 480. "To entitle a man to bring trespass (says he), he must, at the time when the act was done, which constitutes the trespass, either have actual possession in him of the thing, which is the object of the trespass, or else he must have a constructive possession, in respect of the right being actually vested in him." And he puts various cases to illustrate the latter position. It is unnecessary to refer to them, because they will be found at large in Bac. Abr. "Trespass," c. 2, which contains an excellent summary of the doctrine. And Ward v. Macauley, 4 Term R. 489, 490, shows, that in the case of a carrier, his possession is the possession of the owner. Lord Kenyon there said: "In the case put of a carrier, there is a mixed possession; actual possession in the carrier, and an implied possession in the owner." See, also, 1 Chit. Pl. 166, 167; 2 Phil. Ev. p. 133, c. 12, § 1; Putnam v. Wyley, 8 Johns. 337.

The general doctrine has not been much, if at all, contested at the argument. But it is supposed, that the application of it is varied by the circumstance, that an officer of the customs had boarded the ship before the attachment was made, and that though he was not on board at the time, he must be considered as having possession and custody of the ship and her cargo in behalf of the government, to secure their rights, in the same way, as if he had been actually on board, it being the received usage at the customhouse in Boston, to consider the vessel in the custody of an inspector from the time when she is so boarded. Now, without entering into any nice consideration of the question, whether any usage can establish such a possession and custody, contrary to the real fact, it is sufficient to say, that such possession and custody of an inspector is not an ouster of the owner, or incompatible with his constructive possession and right to the property. In the most favorable view the inspector cannot be deemed more than a bailee for the public, with the consent of the owner, and holding a joint and mixed possession for them both. This would certainly constitute no bar to the owner's maintaining trespass against any other person, who should wrongfully displace such possession. A mere wrong-doer, or stranger, has no authority to interfere with, or to encroach upon the rights of the owner, on this account. The possession of the government, for one purpose, cannot justify the goods being taken out of the proper custody, under an authority wholly adverse to the rights of the owner, and under color of overturning his proprietary interest. This is not like the case, where the possession is in a bailee, having an usufructuary interest; but it is at most a naked custody for public purposes. Strictly speaking, the United States have not a lien on the goods for the duties on their arrival; for the owner may elect not to enter them but to go abroad with them in the ship, within the fifteen days allowed for this purpose by law. The most

that can be properly said is, that they cannot be unladen without a permit and securing the duties, or giving a lien by a deposit in lieu thereof; and that, until regularly landed, the government have a right to place an officer on board, to prevent frauds, and to secure due fidelity in the unlivery of the cargo. It was therefore not inaptly said, at the bar, that the inspector was rather a guard than a bailee. The master of the ship still remains in possession for the benefit of his owners.

It is unnecessary to consider, whether an inspector of the customs, actually on board, can be considered, in a legal sense, a bailee. What his rights and duties and powers are, depends upon the provisions of law; and they are not to be extended by any loose implications, or usage. The 53d and 54th sections of collection act of 1799, c. 128 [1 Stat. c. 22], contain an enumeration of his rights, duties, and powers, or at least of the principal of them, as applicable to vessels and cargoes in the predicament of the New Packet. I search in vain in them for any proofs of such an exclusive possession or custody of property, in the predicament of the present, as would defeat the possessory title of the real owner, or disable him from maintaining trespass against a wrong-doer. In a legal sense the defendant was, upon the facts stated, a wrong-doer, and my opinion is, that the plaintiffs have maintained their action.

I meddle not with several questions, which might arise upon cases of this sort. Whether goods arriving in port, before an entry and permit to land them, are attachable by the sheriff or marshal; whether either of them have a right to enter them at the customhouse, or give security for duties. These are grave questions, fit to be argued upon other occasions; and sufficiently embarrassing not to be decided incidentally, but upon full consideration. Judgment for the plaintiff.